**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re: | **Jointly Administered under** |
| | **Case No. 08-45257** |
| Petters Company, Inc., et al., | **Jury Trial Demanded** |
| Debtors. | |
| | Court File Nos. |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 (GFK) |
| PC Funding, LLC; | 08-45326 (GFK) |
| Thousand Lakes, LLC; | 08-45327 (GFK) |
| SPF Funding, LLC; | 08-45328 (GFK) |
| PL Ltd., Inc.; | 08-45329 (GFK) |
| Edge One, LLC; | 08-45330 (GFK) |
| MGC Finance, Inc.; | 08-45331 (GFK) |
| PAC Funding, LLC; | 08-45371 (GFK) |
| Palm Beach Financing Holdings, Inc.) | 08-45392 (GFK) |
| | |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

| | |
|---|---|
| In re: | **Jointly Administered under** |
| | **Case No. 08-46617** |
| Polaroid Corporation, et al., | **Jury Trial Demanded** |
| Debtors. | |
| | Court File Nos. |
| (includes: | |
| Polaroid Holding Company; | 08-46621(GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
| | |
| | Chapter 7 Cases |
| | Judge Gregory F. Kishel |

| | |
|---|---|
| In re: | **Court File No. 09-43847**<br>**Jury Trial Demanded** |
| Petters Capital, LLC, | Chapter 7 Case |
| Debtors. | Judge Nancy C. Dreher |

| | |
|---|---|
| Douglas A. Kelley, in his Capacity as the<br>Court-Appointed Chapter 11 Trustee of<br>Debtors Petters Company, Inc. and Petters Group<br>Worldwide, LLC, John R. Stoebner Trustee For<br>Polaroid Corporation, et. al., and Randall L.<br>Seaver Trustee For Petters Capital, LLC, | Adv. Proc. No. _____<br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| JPMorgan Chase & Co., JPMorgan<br>Chase Bank, N.A., and One Equity<br>Partners LLC, Jacques A. Nasser, Lee M.<br>Gardner, Charles F. Auster, James W. Koven,<br>Rick A. Lazio, J. Michael Pocock, William L.<br>Flaherty and Ira H. Parker, | |
| Defendants. | |

Plaintiffs Douglas A. Kelley, as the court-appointed Chapter 11 Trustee of Petters

Company Inc. and Petters Group Worldwide LLC; John R. Stoebner as the court-

appointed Chapter 7 Trustee for Polaroid Corporation, et al.; and Randall L. Seaver, as

the court-appointed Chapter 7 Trustee for Petters Capital, LLC, by and through their

undersigned legal counsel, Fruth, Jamison & Elsass, PLLC, bring this Complaint, to be

filed in each of the above-captioned bankruptcy proceedings, against defendants

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., One Equity Partners, Jacques A.

Nasser, Lee M. Gardner, Charles F. Auster, James W. Koven, Rick A. Lazio, J. Michael Pocock, William L. Flaherty and Ira H. Parker. Together, defendants received more than $250 million from the multi-billion dollar Ponzi scheme that was operated and controlled by Thomas J. Petters. Plaintiffs, who are Trustees for a number of companies that were owned and controlled by Tom Petters, based on actual knowledge and upon information and belief, state and allege as follows:

<u>**PARTIES**</u>

1.      Plaintiff Petters Company, Inc. ("PCI") is a corporation organized under the laws of the State of Minnesota. PCI is, and at all times relevant herein was, wholly owned by Thomas Joseph Petters ("Petters"), an individual and citizen of the state of Minnesota.

2.      Plaintiff Petters Group Worldwide, LLC ("PGW") is a limited liability company organized under the laws of the State of Delaware. PGW is, and at all times relevant herein was, wholly owned by Petters. PGW served as a holding company for many businesses that Petters owned and controlled.

3.      Plaintiff Polaroid Corporation is a corporation organized and existing under the laws of the State of Delaware. In April 2005, Polaroid Corporation became a wholly-owned subsidiary of PGW pursuant to a merger between Polaroid Corporation's then-parent corporation, Polaroid Holding Company and Petters Consumer Brands, LLC ("PCB"). PCB was a wholly-owned subsidiary of PGW. Prior to this merger, PHC and all its affiliates were majority-owned and controlled directly or indirectly by JPMC. Petters used Ponzi scheme proceeds to fund the Polaroid acquisition. Petters, through PGW and PCB, paid $426 million for Polaroid and of that amount defendants received

more than $250 million. After the merger, Petters served as Chairman and sole member of the Board of Directors of Polaroid Corporation. As a result of the merger, Polaroid Corporation and its parent, Polaroid Holding Company are the successors in interest to PCB.[1]

4.      Petters Capital, LLC ("Petters Capital") is a limited liability company organized and existing under the laws of the State of Delaware. At all times relevant herein, Petters Capital was owned by PGW, and Petters served as its Chairman and sole member of the Board of Directors of Petters Capital. At all times relevant herein, Petters Capital was owned by PGW.[2]

5.      Defendant JPMorgan Chase & Co. ("JPMorgan"), is a corporation organized under the laws of the state of New York and has its principal place of business in New York, New York.

6.      Defendant JPMorgan Chase Bank N.A., is a national banking association chartered under the laws of the United States and has its principal place of business in New York, New York ("JPMorgan Bank"). JPMorgan Bank is owned and controlled by JPMorgan.

---

[1]  Unless otherwise indicated by the context, Polaroid Corporation and Polaroid Holding Company are referred to herein as ("Polaroid").

[2]  For purposes of this Complaint, the estates of PCI, PGW, Polaroid and Petters Capital and their respective Trustees are referred to collectively, depending on the context as "Debtors," "Plaintiffs," or "Trustees."

7.     Defendant One Equity Partners, LLC ("One Equity") is a Delaware limited liability company and has its principal place of business in New York, New York.  One Equity is owned and controlled by JPMorgan.  One Equity Partners and its affiliates, including, JPMorgan and some of the defendants listed below, received more than $240 million in Ponzi scheme proceeds when it sold its ownership stake in Polaroid Holding Company to Petters.

8.     Defendant Jacques A. Nasser ("Nasser") is a resident of the State of Michigan.  At all times relevant herein, Nasser was a Managing director of defendant One Equity and a former director and Chairman of the Board of Polaroid Holding Company.   Nasser received more than $12,800,000 in Ponzi scheme proceeds.

9.     Lee M. Gardner ("Gardner") is believed to be a resident of the State of Michigan.  At times relevant herein, Gardner was a Managing Director of defendant One Equity and a director of Polaroid Holding Company.   Gardner received more than $200,000 in Ponzi scheme proceeds.

10.     Charles F. Auster ("Auster") is a resident of the State of New Jersey.  At times relevant herein, Auster was a Managing Director of defendant One Equity and a director of Polaroid Holding Company.  Auster received more than $900,000 in Ponzi scheme proceeds.

11.     James W. Koven ("Koven") is a resident of the State of New York.  At times relevant herein, Koven was a Managing Director of defendant One Equity and a director of Polaroid Holding Company.  Koven received more than $50,000 in Ponzi scheme proceeds.

12.     Rick A. Lazio ("Lazio") is a resident of the State of New York.  At times relevant herein, Lazio was an Executive Vice President for defendant JPMorgan and a director of Polaroid Holding Company.[3]   Lazio received more than $500,000 in Ponzi scheme proceeds.

13.     J. Michael Pocock ("Pocock") is a resident of the State of California.  At times relevant herein, Pocock was a director, Chief Executive Officer and President of Polaroid Holding Company.  Pocock was actively involved in Polaroid and JPMC's negotiations and due diligence efforts relating to the merger of Polaroid and PCB and received more than $8,500,000 in Ponzi scheme proceeds.

14.     William L. Flaherty ("Flaherty") is a resident of the State of Massachusetts. At times relevant herein, Flaherty was an Executive Vice President and Chief Financial Officer of Polaroid Holding Company.  Flaherty was actively involved in Polaroid and JPMC's negotiations and due diligence efforts relating to the merger of Polaroid and PCB and received more than $5,340,000 in Ponzi scheme proceeds.

15.     Ira H. Parker ("Parker") is a resident of the State of Massachusetts.  At times relevant herein, Parker was the Chief Legal Officer for Polaroid Holding Company.[4]   Parker was actively involved in Polaroid and JPMC's negotiations and due diligence efforts relating to the merger of Polaroid and PCB and received more than

---

[3]   Defendants Nasser, Gardner, Auster, Koven and Lazio are referred to collectively herein as the "JPMC Affiliate Defendants."  Unless otherwise indicated by the context, defendants JPMorgan, JPMorgan Bank, One Equity and the JPMC Affiliate Defendants are referred to collectively herein as "JPMC."

$1,560,000 in Ponzi scheme proceeds.

## PROCEDURAL BACKGROUND

16.     By an order issued on October 3, 2008, pursuant to 18 U.S.C. § 1345, the
United States District Court of the District of Minnesota (the "District Court") placed,
among others, Petters, PCI and PGW into receivership in civil litigation commenced by
the United States of America against, among others, Petters, PCI and PGW (Court File
No. 08-CV-5348) (the "Receivership Action").  In that same order the District Court also
ordered a freeze of all assets that were owned by Petters or any of the businesses he
owned or controlled ("Freeze Order").

17.     By Order of the District Court in the Receivership Action dated October 6,
2008, as subsequently amended and restated on December 8, 2008, the District Court
appointed Douglas A. Kelley, Esq. ("Kelley") as equity receiver (the "Receiver") of any
affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by
Petters, including PCI, PGW, Polaroid and Petters Capital (collectively, the
"Receivership Estate").

18.     As the court-appointed Receiver, Kelley serves as an agent of the United
States District Court for the District of Minnesota and in that capacity possesses the right
to exclusive custody, control and possession of the property, assets and estates of the
Receivership Estate.

---

[4]   Defendants Pocock, Flaherty and Parker are referred to collectively herein as the
"Polaroid Control Defendants"

19.     On October 11, 2008 (the "PCI Petition Date"), PGW and PCI, at the Receiver's direction, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Minnesota, Court File No. 08-45257 and 08-45258.

20.     On October 22, 2008 this Court ordered the PCI and PGW Bankruptcy cases to be administratively consolidated as *In re Petters Company, Inc., et al.*, under case number 08-45257 (the "PCI/PGW Bankruptcy"). The PCI/PGW Bankruptcy case is pending before the Honorable Gregory F. Kishel.

21.     On February 26, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Kelley as the Chapter 11 Trustee for all Chapter 11 debtors the PCI/PGW Bankruptcy matter, which specifically included appointing Kelley as the Chapter 11 Trustee of PCI and PGW (the "PCI/PGW Trustee").

22.     On December 18, 2008 (the "Polaroid Petition Date"), Polaroid and other affiliated Polaroid debtors filed for protection under Chapter 11, of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. The cases are jointly administered under Court File No. 08-46617 (the "Polaroid Bankruptcy"). The Polaroid Bankruptcy case is pending before the Honorable Gregory F. Kishel.

23.     On September 1, 2009, the Polaroid debtors converted the case to one under Chapter 7 of the Bankruptcy Code and this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of John R. Stoebner (the "Polaroid Trustee") as the Chapter 7 Trustee for all Chapter 7 debtors in the Polaroid Bankruptcy.

24.     On June 12, 2009 (the "Petters Capital Petition Date"), Petters Capital, LLC filed for protection under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota, commencing the matter entitled *In re: Petters Capital, LLC*, Court File No. 09-43847 (the "Petters Capital Bankruptcy").  The Petters Capital Bankruptcy case is pending before the Honorable Nancy C. Dreher.

25.     On June 15, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Randall L. Seaver (the "Petters Capital Trustee") as the Chapter 7 Trustee for the Petters Capital Bankruptcy.

## INTRODUCTION

26.     The Plaintiffs bring this action to recover certain transfers made to or for the benefit of defendants by PCI, PGW, Polaroid and Petters Capital.  The transfers were derived in whole or in part from the proceeds of the massive Ponzi scheme orchestrated by Petters and others.  Plaintiffs bring their claims jointly against defendants because their claims are interrelated and will require adjudication of the same facts and issues.  Any recovery obtained through this action shall be apportioned among Debtors in amounts to be determined by the Trustees and approved by the Bankruptcy Courts overseeing the Debtors' cases.

27.     The Plaintiffs seek to recover, among other things, transfers made to defendants in connection with Petters' acquisition, effected through PGW and PCB, of Polaroid Holding Company for approximately $426 million in early 2005.  At the time of the Polaroid transaction, JPMC directly or indirectly controlled and was the majority owner of Polaroid.  Of the $426 million that was transferred through PCB to acquire

Polaroid, JPMC received more than $240 million and the Polaroid Control Defendants received more than $15,450,000. All of the money that Petters used to fund the purchase of Polaroid was derived from the Ponzi scheme or Ponzi scheme investors. In addition to the Ponzi-scheme proceeds that JPMC received when it sold its Polaroid ownership stake to Petters, JPMC also received an estimated $40 million in fees and interest both for its role as financial advisor to Polaroid and as a result of a $185 million credit facility that JPMorgan Bank provided to Polaroid immediately after PCB merged with it. That credit facility was completely paid off prior to the PCI Petition Date. Some or all of the payments made by Debtors to JPMC to pay off the principal and interest of that credit facility, as well as obligations arising out of that credit facility, are also avoidable under applicable provisions of the United States Bankruptcy Code and the Minnesota Uniform Fraudulent Transfer Act.

28.    Together, PCI, PGW, PCB and Petters Capital provided nearly all of the funding for the acquisition of Polaroid. Plaintiffs provided the funding through transfers to escrow accounts controlled by PGW and PCB in the months leading up to the sale and merger transaction. The funds in the escrow accounts were then transferred to the shareholders of Polaroid, including defendants.

29.    Prior to the Polaroid transaction, JPMC and the Polaroid Control Defendants had an opportunity to conduct extensive due diligence on Petters and his companies. During the course of their due diligence, JPMC and the Polaroid Control Defendants uncovered or should have uncovered numerous red flags that should have put JPMC and the Polaroid Control Defendants on notice of the Petters Ponzi scheme.

However, the windfall that JPMC and the Polaroid Control Defendants would earn on the transaction gave JPMC and the Polaroid Control Defendants an incentive to ignore these red flags. The red flags included: (i) evasive emails from the Petters team in response to due diligence inquiries; (ii) lack of tax returns and audited financial statements for PCI, the central Ponzi scheme business that funded most of the Polaroid acquisition; (iii) the fact that Petters' lenders were charging at least 15-25% interest on loans to his businesses even though his businesses were supposedly generating billions of dollars in revenue and hundreds of millions of dollars in profits; (iv) not a single Petters-controlled business was profitable; (v) eleven judgments filed against Petters; and (vi) Petters had previously been convicted and jailed for crimes involving dishonesty and theft.

30.     JPMC and the Polaroid Control Defendants knew or should have known that the funds Petters used to acquire Polaroid were derived from fraud. Indeed, JPMC structured the Polaroid transaction in a way that suggests that it knew or suspected that Petters' money was tainted. JPMC had indicated it was very wary of Petters' way of financing. As a result, JPMC insisted that before it would agree to any post-merger financing for Polaroid, Petters would have to obtain a "firm commitment" letter – meaning a letter from a major bank committing to provide all the funds necessary for the transaction. No legitimate bank would issue such a letter for Petters or his businesses so, JPMC came up with an alternative arrangement. Instead of a firm commitment letter, JPMC required that PCB obtain funding for the entire $426 million purchase price, place all the money in two escrow accounts and complete the merger. Only then would JPMC provide financing for Polaroid.

31. To comply with JPMC's requirement, Petters used Ponzi scheme proceeds to fund the escrow accounts. All of these funds flowed through either PCI, PGW, PCB, and Petters Capital. Those proceeds were then used to pay Polaroid shareholders, including the $240 million that went to JPMC. In fact, the Polaroid acquisition closed on April 27, 2005, and the JPMC financing (approximately $185 million initially) closed the next day. Most of the money JPMC loaned was used immediately to pay down the Ponzi scheme investors who had provided some of the funds for the escrow accounts. There is no reasonable explanation for this convoluted closing process except a desire by JPMC to distance itself from Petters' funding sources.

32. The fact that JPMC and the Polaroid Control Defendants knew or should have known about Petters' fraudulent scheme renders the transfers defendants received from Plaintiffs for the Polaroid transaction recoverable as fraudulent transfers because JPMC and the Polaroid Control Defendants lacked good faith when they received the transfers. The transfers related to the Polaroid transaction are also avoidable because Petters and his businesses did not receive reasonably equivalent value in exchange for the more than $250 million that was paid for defendants' ownership interest in Polaroid.

33. Defendants are initial transferees of the fraudulent or otherwise avoidable transfers alleged in this Complaint, are entities for whose benefit such transfers were made, or subsequent transferees of any such initial transferee.

## JURISDICTION VENUE AND STANDING

34. This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The claims asserted herein arise under the

Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code.

35.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (H) and (O).

36.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

37.     The Plaintiffs have standing to assert the claims herein pursuant to Sections 323, 544, 548, 550 and 1106 of the Bankruptcy Code.

## FACTUAL BACKGROUND

### THE PETTERS PONZI SCHEME

38.     The multi-billion dollar Petters Ponzi scheme is well documented and many of those involved have pled guilty to perpetrating various aspects of the fraud.  The scheme's central figure, Petters, was convicted by a jury and sentenced to 50 years in prison for his leading role in perpetrating this massive fraud.

39.     Petters has multiple felony convictions for crimes involving fraud and dishonesty.  He was convicted of forgery, larceny, and fraud in Colorado in 1989 and served time in jail for these crimes.  In 1990, in Minnesota, Petters was charged with two counts of theft by check.  Petters pled guilty to one count and the other count was dismissed.  Petters also had numerous court judgments entered against him in civil matters over the years.

40.     Petters operated the Ponzi scheme through business organizations that he directly or indirectly owned and controlled from approximately 1993 through on or about the date of his arrest by federal agents on October 3, 2008.  Petters, through various

entities that he controlled, including PCI, PGW, PCB and Petters Capital, laundered what is estimated to be an amount in excess of $40 billion.

41.     At various times during the course of the Ponzi scheme, Petters was assisted in the operation of the scheme by numerous individuals and conspirators (the "Associates").  Some of these Associates have pleaded guilty to various crimes relating to the Ponzi scheme.  Other Associates who participated in or aided and abetted the fraud may also face criminal or civil actions as the investigation of the Ponzi scheme continues.

42.     The scheme orchestrated by Petters and his Associates was a common species of fraud known as a Ponzi scheme.  Petters, through a multitude of entities and with the assistance of his Associates, would induce investors into financing the purchase of non-existent electronic equipment purportedly secured by fabricated purchase orders or otherwise provide financing for fabricated purposes.  Petters used funds invested by later investors to repay initial investors.

43.     Petters, through PCI, PGW, and a multitude of shell companies through which he operated, intended that the payments to early investors would induce ongoing, repeated, greater and more widespread investment in the Ponzi scheme and thereby further perpetrate and perpetuate the fraud.

44.     To obtain investors in the Ponzi scheme, Petters and his Associates portrayed PCI as a middleman that purchased consumer electronic goods or other goods from wholesalers and resold the merchandise to large, "big box" retailers such as Costco, Sam's Club and B.J.'s.

45.     Petters and his Associates prepared and utilized fabricated documents that were represented to investors to be equipment purchase orders and related documents. The fabricated documents included, but are not limited to, (1) purchase orders from PCI to suppliers purportedly ordering electronic goods, and (2) purchase orders from retailers to PCI purportedly ordering electronic goods for purchase from PCI. The purchase orders and the related documents were entirely fictitious.

46.     PCI would show a "profit" on each transaction because PCI's fabricated purchase order from the big box retailer for the merchandise was always for an amount greater than the amount of PCI's fabricated purchase order to its supplier for the same nonexistent merchandise. Petters and his Associates, through PCI, created fictitious profits at will on each and every transaction by simply writing in the appropriate quantity and price information on the two sets of purchase orders to "produce" the necessary funds.

47.     Because the transactions described in the fictitious purchase orders in fact did not exist, the only way PCI was able to transfer sufficient funds to investors was by money obtained from other investors, in other words, through the operation, control and management of the Ponzi scheme by Petters and his Associates.

48.     Over the years, Petters raised billions of dollars through his scheme. Petters' Ponzi scheme relied on a few key feeder funds, the owners of which either knew or should have known about the fraud. These funds would raise money from unsuspecting investors and then funnel the money to Petters in exchange for the false profits that generated a consistent return on investment far above anything these funds

could achieve by investing in legitimate businesses. Among the feeder funds that bought notes from PCI were funds controlled by another defendant in the Ponzi scheme, Gregory Bell ("Bell"). Bell controlled at least three funds known as the "Lancelot Funds."

49.     Bell and the Lancelot Funds raised approximately $2.6 billion dollars between 2001 and August 2008. Almost all of this money was used to invest in the Ponzi scheme. On October 7, 2009, Bell pled guilty to wire fraud in connection with his transactions with Petters and was recently sentenced to five years in prison.

50.     Other significant Ponzi scheme feeder funds included Epsilon and a related entity called Stafford Towne Limited (together, "Epsilon/Stafford Towne"), as well as a fund known as Metro Gem. Metro Gem is one of a number of businesses owned and controlled by Frank E. Vennes, Jr. ("Vennes"). Vennes had extensive business dealings with Petters and earned millions of dollars in finder's fees for locating Ponzi scheme investors for Petters. Vennes is a convicted felon and served time in prison in the late 1980s and early 1990s for money laundering and other crimes.

51.     Epsilon/Stafford Towne, Metro Gem and other feeder funds have been sued by the PCI/PGW Trustee to recover hundreds of millions of dollars in false profits they received from the Ponzi scheme.

52.     In the end, Petters proved to be an accomplished fraudster but a terrible businessman. Neither PCI nor any other business that Petters owned actually made money. Business losses among the Petters companies were routinely propped up by proceeds from the Ponzi scheme.

53.     Despite his mountain of failed businesses, Petters and some of his

Associates enjoyed a lavish lifestyle funded entirely by the massive Ponzi scheme.  Some

of Petters' cronies and Ponzi scheme investors who were lucky or smart enough to get

out early also made millions.  However, among the individuals and businesses that

actually profited from the Ponzi scheme, few, if any did better than JPMC.

## JPMC'S ASSOICIATION WITH PETTERS

### Petters Begins His Relationship With JPMC

54.     JPMC's involvement with Petters and his giant Ponzi scheme is

multifaceted and goes back many years.  Petters first opened an investment account with

JPMorgan in 2001.  Petters opened this investment account as a place to put phony profits

generated by the Ponzi scheme.  Courtney Cavatoni ("Cavatoni") was the lead banker

responsible for the overall relationship between Petters and JPMC.  Cavatoni spoke

frequently with Petters and his Associates and met with Petters at least annually to review

his investments.

55.     Over the years the relationship between JPMC and Petters blossomed.

Petters opened additional investment accounts with Cavatoni at JPMC.  Between June

2002 and September 2007, more than $83 million flowed into these investment accounts.

56.     Upon information and belief, all of the money that flowed into these

investment accounts was derived from the fraudulent Ponzi scheme.  This includes but is

not limited to:  (1) $60 million from PCI; (2) $2.5 million from PGW; and (3) more than

$11 million from other entities Petters controlled.

**JPMC Issues a Credit Line to PGW**

57.     On March 13, 2006, JPMorgan Bank issued PGW an $8 million credit line. This credit line was secured by Petters' personal guaranty dated March 16, 2006, and by a collateral agreement that pledged two of his JPMC investment accounts.

58.     On May 2, 2006, PGW's credit line was increased to $20 million and the collateral agreement was amended to add an additional Petters investment account as collateral.

59.     On September 19, 2006, Cavatoni and a number of other JPMC bankers met with Petters and several PGW officers and employees at PGW's offices in Minnetonka, Minnesota.  On information and belief, the purposes of this meeting were to further solidify the banking relationship between JPMC and Petters and to obtain an increase in the PGW credit line.  This meeting included Mary Jeffries, whom Petters appointed as CEO of Polaroid as well as Camille Chee-Awai, who was a principal of feeder fund Epsilon/Stafford Towne and was also acting as head of Petters Capital.  The meeting included a presentation about PGW and its purported successful businesses.  The presentation made numerous claims about Petters' business that were misleading and in many instances, patently false.  For instance, the presentation described Petters Capital as a "captive finance company" for which Petters had provided all the equity capital and that "had approximately $220 million in equity and $298 million of interest yielding assets."

60.     JPMC knew or should have known that the claims made about Petters' businesses were false.  Petters could not have provided $220 million in real equity to Petters Capital or any other entity because Petters had no source of capital other than the

Ponzi scheme. The "interest yielding assets" that were touted for Petters Capital were nothing more than IOU's that Petters Capital had received from Petters or his money losing businesses. JPMC knew or should have known the truth about Petters Capital because, as discussed below, Petters Capital was instrumental in funding Petters' purchase of Polaroid from JPMC in 2005.

61.     One of the possible reasons Petters needed the PGW credit line extended was to purchase a 50% interest in Sun Country Airlines. Petters accomplished this purchase in October 2006, using his investment accounts at JPMC and the PGW credit line in a Byzantine series of transfers that can only be explained as an attempt to launder funds. The transfers included eight separate transfers from PCI into Petters' personal investment accounts totaling $17.5 million. On October 31, 2006, Petters caused $15 million to be transferred to the PGW credit line. Then $15 million was transferred from the PGW credit line to another Petters-owned company called Thomas Petters, Inc. ("TPI"). On the same day, TPI transferred $15 million to another Petters-owned company, Petters Aviation, LLC, which then purchased 50% of Sun Country Airlines that same day.[5] On November 2, 2006, Petters transferred $15 million back to the PGW credit line. Although the convoluted nature of these transactions strongly suggests an

---

[5]   The other 50% in Sun Country Airlines was purchased by White Box Advisors, a Minneapolis based hedge fund. In November 2007, Petters Aviation acquired the 50% interest in Sun Country Airlines from White Box. Like other Petters-controlled businesses, Sun Country lost money and was propped up with Ponzi scheme proceeds. Sun Country Airlines filed bankruptcy soon after federal agents raided Petters' offices.

attempt by Petters to launder funds and conceal their origin, JPMC never raised any concerns about these transactions.

62. On September 26, 2006, one week after the PGW presentation, JPMC increased the PGW credit line to $40 million dollars. This apparently was based solely on the fact that Petters' personal investment accounts held at JPMC were securing the loan. To secure this increase, a new collateral agreement was prepared that added another Petters investment account as well as his ownership interest in various hedge funds held at JPMC. However, this revised collateral agreement was not signed until March 25, 2008.

63. When JPMC learned about the September 24, 2008 raid of Petters' offices by federal agents, JPMC declared the PGW credit line in default. On or about September 30, 2008, JPMC seized and began to liquidate the approximately $25 million in securities then held in Petters' personal investment accounts. At the time, JPMC claimed that PGW owed $19,641,000 on its credit line.

64. As of October 6, 2008, JPMC had seized and liquidated $18.1 million of the assets in Petters' investment accounts. By seizing and liquidating the investment account assets, JPMC reduced the balance on the PGW credit line to $1,500,000 from a pre-raid balance of $19,641,000. Some of the asset sales by JPMC were not completed until after the October 3, 2008 Freeze Order was issued.

65. By seizing and liquidating Petters' investment accounts after news of the federal raid, JPMC stepped ahead of the Ponzi scheme's victims and creditors to recover

the nearly $20 million that PGW allegedly owed under the credit line.[6]  This fraudulent transfer, however, is just the tip of the iceberg when it comes to JPMC's extensive business dealings with Petters and represents only a small fraction of the Ponzi scheme proceeds that JPMC received from Petters and his businesses.

## JPMC AND THE POLAROID ACQUISITION

66.     During the same period that Petters was moving tens of millions of dollars of fraud proceeds through his JPMC investment accounts, JPMC engineered a transaction with Petters that would generate hundreds of millions of dollars for JPMC.  This transaction was the acquisition of Polaroid Holding Company for $426 million in April 2005.  The acquisition was accomplished through a merger of Polaroid Holding Company and PCB (the "Merger"), pursuant to a merger agreement among PGW, PCB and Polaroid Holding Company dated January 7, 2005.  Prior to the Merger, JPMC directly or indirectly controlled and was majority owner of Polaroid Holding Company.

67.     JPMC earned substantial fees and profits for the numerous roles it play in the Merger.  JPMC was the: (i) seller, as it was the majority owner and controlled Polaroid; (ii) financier, as it loaned more than $185 million dollars to Polaroid immediately following the Merger (but only after Petters funded the purchase of Polaroid with Ponzi scheme proceeds and caused Polaroid to grant JPMC a first secured lien on all of Polaroid's assets); (iii) syndicate manager, as it formed and managed a syndicate of banks that would participate in JPMC's loans to Polaroid; and (iv) financial advisor, as it

---

[6]  Douglas Kelley, as Receiver for Petters, intends to pursue a claim in District Court to recover these transfers out of Petters' personal investment accounts.

served as investment advisor on the Merger, generating millions in fees that were paid at the closing out of Polaroid's cash. Although its roles as lender and investment advisor generated as much as $40 million in fees and interest for JPMC, that figure is dwarfed by the profits JPMC earned by selling its Polaroid ownership stake to PCB.

68.     JPMorgan acquired its ownership stake in Polaroid by acquiring One Equity as part of its merger with Bank One in early 2004. One Equity had purchased Polaroid's assets out of another bankruptcy in July 2002. One Equity's purchase of Polaroid's assets was structured as a leveraged buyout ("LBO"). In a conventional LBO, an investor buys the stock of a company financed in part with the acquired company's cash and with debt that will be serviced by the acquired company's cash flow and secured by the acquired company's assets.

69.     When it purchased Polaroid's assets out of bankruptcy, One Equity formed PHC. PHC then issued to One Equity 580,000 shares of Series A Preferred Stock for $58 million and 20,000,000 shares of common stock for $2 million. This stock represented a 65% holding in PHC, with 35% of the ownership granted to Polaroid's former shareholders and creditors in the bankruptcy case. By the end of 2004, One Equity had caused PHC to use its cash to redeem all of One Equity's Series A preferred stock for $58 million plus accrued interest, meaning that by the end of 2004, One Equity had recouped nearly its entire investment in Polaroid.

70.     Soon after it bought Polaroid out of bankruptcy, One Equity installed one of its own managing directors, defendant Jacques Nasser, as Polaroid's chairman. One

Equity, and by extension JPMC, would remain the majority owner and in control of Polaroid until its merger with PCB in 2005.

### Polaroid's Business Declines Rapidly After the One Equity LBO

71.     After the One Equity LBO, Polaroid's revenues declined rapidly. Polaroid's core business, instant film and cameras, was drying up due to the onset of digital cameras and digital photography. According to Polaroid's filings with the Securities and Exchange Commission, Polaroid's revenue was $808 million in 2002, $753 million in 2003, and $656 million in 2004. As of December 2004, Polaroid projected revenue for 2005 of only $515 million. As the decline of Polaroid's core business accelerated, One Equity searched for ways to generate additional revenue for Polaroid. This included efforts to license the Polaroid brand.

### PCI Acquires a License for the Polaroid Brand

72.     On information and belief, on or about September 1, 2002, PCI entered into a license agreement with Polaroid, which was amended in December 2002 as the Amended and Restated License Agreement ("License Agreement"). The License Agreement allowed PCI to use the Polaroid brand on home DVD players, home cinema systems, televisions, and combination television/digital video disc players. In return, PCI was to pay Polaroid a royalty of 3% for each licensed device PCI sold with a minimum payment of between $1 million to $4 million per year between 2003 and 2006.

73.     In January 2003, Petters formed PCB as an independent operating company of PGW. The plan was for PCB to contract with overseas manufacturers to make portable DVD players and televisions under the Polaroid brand and then sell them to big

box retailers such as Wal-mart, Target and Best Buy. Unlike PCI, PCB actually sold merchandise. However, PCB's margins were so low that its business could not be sustained without inflows of capital from the Ponzi scheme and its investors.

74.    In 2003, PCB generated $119 million in sales, but its gross margin was only 5.2% and it lost nearly $5.5 million. In 2004, PCB's sales grew to $282 million, but its gross margin shrank to just 2.1% and it lost nearly $15 million. To fund these losses, Petters looked to his usual Ponzi scheme investors.

75.    For instance, in 2004, PCB entered into a series of promissory notes with Thousand Lakes, LLC, one of the Ponzi scheme's special purpose entities set up by Petters to receive funding from Greg Bell and the Lancelot Funds. These notes carried an annual interest rate of 18%. As of December 31, 2004, PCB owed Thousand Lakes in excess of $42 million.

**Polaroid Threatens to Terminate the License Agreement**

76.    At the same time losses were mounting at PCB, Polaroid began to harass Petters about the Polaroid license and began making threats to terminate it. These threats culminated in a meeting with Petters, Nasser and Pocock in New York City on September 2, 2004, at the Four Seasons Restaurant. At this meeting, Nasser threatened that unless Petters agreed to purchase Polaroid, Polaroid could terminate its license.

77.    Nasser had a strong motivation to convince Petters to buy Polaroid. As a reward for becoming Chairman of Polaroid, Nasser had been issued more than one million shares of Polaroid stock. On information and belief, Nasser and JPMC knew

Polaroid's core business, instant film, was rapidly deteriorating and a quick sale to Petters would be their best hope for a big payday.

78.     For Petters, the purchase of Polaroid would eliminate Polaroid's ability to harass and threaten PCB over its license.  It would also provide an opportunity to help Petters launder some of the Ponzi scheme fraud proceeds by using them to acquire a legitimate business that – at least momentarily – generated positive cash flow.  Petters eventually agreed to purchase Polaroid for approximately $426 million and merge Polaroid with PCB.  The Merger was announced on January 7, 2005.

**Ponzi Scheme Funds are Used to Fund the Polaroid Merger**

79.     To increase its profit on the sale of Polaroid and to ensure the transaction would be completed, JPMC agreed to help finance the transaction.  The financing (the "Credit Facility") consisted of a $125 million Fixed-Asset Term Loan (the "Term Loan") and a $225 million asset-based revolving loan (the "Revolver").  Because the amount loaned on the Revolver was based on Polaroid's receivables and inventory, only $60 million was advanced initially.

80.     Despite the fact that JPMC was going to provide more than $185 million in financing, PCB was required to come up with the entire purchase price and place the money into two escrow accounts prior to closing.  One escrow account would hold a $40 million breakup fee and the other would hold the balance of the purchase price.  The escrow accounts were in the name of and controlled by PCB and PGW ("Petters Escrow Accounts").

81.    To fund the Petters Escrow Accounts, Petters used money funneled from the Ponzi scheme and its stable of feeder funds, including Lancelot (Bell), Metro Gem (Vennes) and Epsilon/Stafford Towne.  A significant portion of this money was funneled from PCI or its lenders through Petters Capital.  Petters Capital played a key role in funding the Polaroid transaction, as at least $241 million of the money that was used to fund the Petters Escrow Accounts was transferred through it.  Petters Capital had no operating business and appears to have been formed solely as a conduit through which PCI money or that of its lenders flowed into the Petters Escrow Accounts.

82.    All of the money that Petters used to fund the Polaroid acquisition came through one or more of the Plaintiffs in a series of transactions that took place in early 2005.  In summary, money flowed into the Petters Escrow Accounts as follows:

- $106 million was transferred from PCI into Petters Capital and then into the Petters Escrow Accounts.

- $11.1 million was transferred from PCI to PCB (n/k/a Polaroid) and then into the Petters Escrow Accounts.

- $7.9 million was transferred from PCI to the Petters Escrow Accounts.

- $100 million was transferred from Lancelot Funds to Petters Capital and then to the Petters Escrow Accounts.

- $125 million was transferred from Lancelot Funds to the Petters Escrow Accounts.

- $97 million was transferred from Epsilon/Stafford Town to PCB and then $50 million was transferred to the Petters Escrow Accounts (approximately $47 million was transferred back from PCB to Epsilon/Stafford Town).

- $35 million was transferred from Metro Gem to Petters Capital and then to the Petters Escrow Accounts.

**JPMC Structures the Polaroid Acquisition to Distance Itself from the
Funding While Reaping Millions in Fees and Interest**

83.　　JPMC appears to have structured the sale of Polaroid so that none of its

money would be used to complete the merger and cash out the shareholders, including

Polaroid's largest and controlling shareholder, One Equity.　JPMC also structured the

transaction to ensure that it would generate significant investment banking fees and

interest on loans that it would make *after* Petters and his business affiliates completed the

funding and purchase of Polaroid.　For example, JPMC served as Polaroid's investment

advisor for the Merger.　JPMC earned in excess of $4 million for this service, which was

paid out of the closing proceeds, thereby reducing the cash that would be left in Polaroid

after it merged with PCB.

84.　　JPMC's multiple roles as seller, investment advisor to pre-Merger Polaroid,

lender to post-Merger Polaroid, as well as personal investment advisor to Petters, created

significant conflicts of interest.　Because of these conflicts of interest, Polaroid was

forced to hire Lehman Brothers to give a fairness opinion to pre-Merger Polaroid.　On

information and belief, Lehman Brothers was paid at least $1.7 million by Polaroid for

this fairness opinion, further reducing the cash that would be left in Polaroid when it was

acquired by Petters.[7]

---

[7]　At the time of the Merger, Lehman Brothers and JPMC had a very close relationship.
That relationship soured after Lehman Brothers' now-infamous collapse.　Lehman
Brothers recently filed a lawsuit against JPMC seeking to avoid in excess of $8 billion in
transfers made to JPMC prior to Lehman Brothers' bankruptcy filing.

85.     The Merger was extremely lucrative for JPMC.  Just two-and-a-half years after acquiring Polaroid's assets out of bankruptcy and after depleting Polaroid's cash to recoup its investment, JPMC orchestrated the sale of Polaroid for approximately $426 million.  JPMC received approximately $240 million of the proceeds from the sale of Polaroid to Petters.  This money represented substantial profit to JPMC because One Equity had already recouped nearly all the money it had invested when it bought Polaroid's assets out of bankruptcy two-and-a-half years earlier.

86.     The $240 million profit and $4 million in advisor fees was not the only money that JPMC made as a result of the Polaroid Merger.  On April 28, 2005, the day after the Merger closed and JPMC's Polaroid ownership had been transferred to PCB, JPMC closed on its $185 million Credit Facility.  This Credit Facility generated another $4.5 million in commitment fees and as much as $40 million in interest for JPMC and its lending partners.

**JPMC and the Polaroid Control Defendants Conduct Due Diligence But Ignore Red Flags about Petters and his Fraudulent Businesses**

87.     In its role as investment advisor to Polaroid and as a lender to the post-Merger Polaroid, JPMC, as well as the Polaroid Control Defendants, had an opportunity to conduct significant due diligence on Petters and his companies.  For example, JPMC hired a private investigation firm to investigate Petters and other employees of Petters' businesses.  This investigation revealed that Petters was named on 11 judgments.  However, JPMC either failed to or chose not to follow up on this report that raised significant questions about Petters.  Had it chose to follow-up on this red flag, JPMC

would have discovered that Petters also had previously spent time in jail in Colorado arising out of fraud and forgery charges and had pled guilty to a theft charge in Minnesota.

88.     In addition to ignoring red flags raised about Petters' honesty and character, JPMC knew or should have known that the PCB/Polaroid business combination was unsustainable given the significant post-Merger debt that Polaroid would have to service and the fact that Polaroid's higher-margin instant film business was fading away,

89.     JPMC knew that that the combined company would begin its post-Merger life with at least $310 million in debt.  This included the $125 million Term Loan and approximately $60 million advanced on the $225 million Revolver.  It also included $125 million in subordinated debt ("sub debt") that JPMC required Petters to obtain.  Petters obtained this sub debt from Petters Capital, which in turn obtained the money from PCI and its investors.  The interest rate on the JPMC $125 million Term Loan exceeded 11%, the Revolver charged about 7% interest, and the interest rate on the $125 million Petters Capital sub debt was set at 15%.  JPMC knew all this debt would generate interest expense for post-Merger Polaroid in excess of $35 million a year.  More importantly, JPMC knew that most of this debt would be used to pay off loans that Petters and his stable of Ponzi-scheme lenders used to fund the escrow accounts and very little would be left for working capital.  In fact, of the $310 million in initial financing, a total of $304 million would be used to pay off debt that Petters had obtained from Ponzi-scheme lenders like Lancelot Funds, Metro-Gem and Epsilon/Stanford Towne.  This would leave post-merger Polaroid with only about $25 million of cash for operations.

90. But post-Merger Polaroid would need far more than $25 million of cash to survive. Although the Polaroid business would generate some cash while the Polaroid instant film business was winding down, PCB's low margin consumer electronics business consumed huge amounts of cash. JPMC knew that in 2004 PCB lost over $14 million on sales of $282 million and had fallen well short of its budgeted gross margin.

91. Moreover, JPMC knew that to fund the huge increase in low-margin sales from $282 million to $600 million, PCB would need to borrow heavily to finance the required increase in inventory and receivables. In 2004, when PCB generated $282 million in sales, PCB's operations used more than $90 million in cash and had to generate $98 million in cash through financing activities. Assuming PCB would need to use at least that much cash if it doubled sales in 2005, JPMC knew or should have known that the combined company would need to borrow in excess of $100 million for working capital, even if Polaroid's core business generated cash as projected. This would mean that the combined company would have to service approximately $400 million in debt in its first year and even more going forward, unless it sold assets to pay off the debt.

92. JPMC knew that the debt placed on post-merger Polaroid combined with the debt necessary to fund the low-margin, cash-burning consumer electronics business would leave Polaroid insolvent no later than 2008 and likely much sooner absent more Ponzi scheme funding from Petters. This put JPMC on notice that the sale of Polaroid and the Credit Facility could be set aside as fraudulent transfers if Polaroid were to become insolvent and file for bankruptcy. In fact, one of the lenders that JPMC was soliciting to participate in the Polaroid facility warned JPMC that "it appears that certain

**fraudulent conveyance issues** may arise out of the acquisition, merger and loan and security transactions contemplated herein."

93.     JPMC also had an opportunity to perform due diligence concerning PCI, which JPMC knew or should have known was a Ponzi scheme.  JPMC knew that PCI was the origin of at least $150 million of equity that Petters was supposedly going to contribute to the merger and knew or should have known that PCI was the source for the $125 million of sub debt that JPMC required as a condition for providing the Credit Facility.  Had JPMC inquired into PCI, it could have quickly learned not only that PCI lacked audited financial statements for most years, but also that it had not filed tax returns since 2002.

94.     The PCI business model was highly suspect.  Its business supposedly consisted of buying large amounts of "diverted" electronics and selling it to big box retailers such as Wal-Mart, Costco and Sam's Club.  However, JPMC knew or should have known that PCI was paying above-market interest rates to its lenders.  JPMC knew or should have known that a business that relied on selling to legendary margin-cutters like Wal-Mart, Costco and Sam's Club could not possibly operate a sustainable business if it had to pay interest rates from 15-24% or even higher to finance its inventory.

95.     When JPMC did bother to ask about PCI's lenders, it was given evasive and incomplete answers.  For instance in one email exchange, JPMC's attorneys asked for "all Petters debt documents."  This boilerplate due diligence request was not unusual and should have been complied with easily.  However, in response Baer, an in-house

attorney at PGW, expressed "significant anxiety" over disclosing such documents in part because:

> these lenders have long and deep relationships with Petters. We use them in many parts of our enterprise. As of today they do NOT know that they will be paid off at closing. When we tell them, there will be great pain for us.

JPMC knew that this paranoid response was evasive and inaccurate. JPMC knew that this email was false and that the Ponzi scheme lenders such as Lancelot Funds and Metro Gem were aware they would be paid off after the merger and in fact JPMC received pay-off letters from each such lender.

96.     In addition to the patently false email response from Baer, JPMC also chose not to follow up on the very questionable answers it received to its rudimentary questions about the origins of the $150 million in equity and $125 million in sub debt that Petters was supposed to contribute to the Merger. In an April, 21, 2005, email, JPMC's counsel asked the CEO of PGW, Stuart Romenesko ("Romenesko"), about the origin of $150 million in equity. JPMC's attorney also asked for additional clarity on the identity of Lancelot, which had been identified as a lender to PCI and one of the supposed sub-debt investors.

97.     Again, the response JPMC received was transparently evasive and incomplete, but at a minimum it put JPMC squarely on notice that much of the funding for the Polaroid acquisition was coming from PCI. Romenesko told the attorney he would get back to him about Lancelot. With respect to the equity, Romenesko stated:

> the equity for this transaction came from Petters Group World Wide (PGW) to Petters Consumer Brands (PCB) (since PCB is wholly owned by PGW)

via an investment by Petters Company, Inc. (PCI and sister Company to PGW)  PCI is an entity owned 100% by Petters and which has substantial built up equity.  All of these entities (PGW, PCB and PCI) are controlled and owned by Petters and are set-up in this manner so that they operate as Independent Operating Companies as well as for tax purposes.  The $150 million of equity put into this transaction is the result of built in equity in Petters Company, Inc.  There are no other individuals (other than for Tom Petters himself) that own the equity put into this transaction.

98.    Had JPMC properly followed up to verify this explanation, it would have learned that PCI had no real equity, had not even filed current tax returns and had no current or properly audited financial statements.   JPMC also did not inquire further into its unanswered questions about Lancelot.  If it had, it would have discovered that the Lancelot Funds were nearly 100% invested in the Petters Ponzi scheme.  Bell, Lancelot's founder and long time Petters associate, has since pled guilty to wire fraud in connection with his participation in the Petters Ponzi scheme and is currently serving a five-year prison sentence.

99.    JPMC's due diligence efforts exposed these and other red flags that placed or should have placed JPMC on notice that Petters' money was derived from fraud. JPMC's due diligence efforts were performed on its own behalf as well as Polaroid's behalf, as it was acting as Polaroid's investment advisor on the negotiations and due diligence leading up to the Merger.  The Polaroid Control Defendants were involved in the negotiations and due diligence efforts and were among the intended beneficiaries of all such efforts and are deemed to have all the facts and knowledge acquired during due diligence by their agent, JPMC.

**JPMC Earns Millions More in Fees and Interest for its Post-Merger Financing**

100.    The day after the merger closed on April 27, 2005, JPMC closed on its $185 million Credit Facility for the now Petters-owned Polaroid and took a first lien position on all of the combined company's assets, which Petters had just paid $426 million to acquire.  The first lien position would eliminate most of JPMC's risk and allow it to reap another $4.5 million in commitment fees and over $15 million annually in interest.  The first lien position also gave JPMC enormous leverage, which it would use later to pressure Polaroid to pay off the JPMC loans early as post-Merger Polaroid teetered toward bankruptcy under the weight of its crippling debt.

101.    The $125 million Term Loan was used entirely to repay debt that Petters had used from PCI and PCI investors to fund the Petters Escrow Accounts, rather than for working capital for the benefit of Polaroid.  On April 28, 2005, JPMC transferred $50 million to Epsilon/Stafford Towne, which had provided approximately $100 million for the Polaroid transaction, and $75 million to Lancelot Investments, which had provided more than $200 million to fund the Petters Escrow Accounts.

102.    JPMC knew or should have known that post-merger Polaroid, burdened with staggering debt, a crumbling core business and the low margin PCB consumer electronics business, would not be able to survive long term.  To ensure that it would be repaid before Polaroid was forced into bankruptcy, JPMC began to pressure Petters to sell off Polaroid assets so it could pay off the JPMC loans early.  In response to this pressure, PCB repaid the 6-year Term Loan in a little over two years, largely through proceeds

from the sale of Polaroid's real estate and intellectual property. Despite being paid off four years early on the Term Loan, JPMC continued to pressure Polaroid to pay off the five-year Revolver, which it did in February 2008. JPMC knew or should have known that Polaroid was losing money and did not have the cash available to pay off JPMC. JPMC also knew or should have known that to pay off the JPMC loans early, Polaroid would be forced to obtain more Ponzi scheme money from Petters and PCI. Having been pressured to pay down the JPMC loans early, in 2007 Polaroid was forced to borrow $40 million of Ponzi scheme proceeds from PCI at 24% interest.

103.     Between JPMC's profit on the sale of Polaroid, its investment advisor fees and the interest and fees it earned on its Credit Facility, JPMC received in excess of $280 million as a result of the Polaroid transaction with Petters and PCB.

**Polaroid Collapses and Files Bankruptcy (Again) in 2008**

104.     Although the sale of Polaroid to Petters was highly lucrative for defendants, it was disastrous for Polaroid and the creditors of Petters, PCI and PGW.

105.     Polaroid was never profitable after the Merger and filed bankruptcy on December 18, 2008, approximately three and a half years after the Merger.

106.     On April 16, 2009, most of the assets of Polaroid were sold out of bankruptcy for approximately $86 million.

## DAMAGES

107.     Losses as a result of the Polaroid transaction exceed $300 million based on the difference between the $426 million Polaroid purchase price (not including the value of the contributed PCB consumer electronics business) and the approximately $86

million received for Polaroid when most of its assets were sold out of bankruptcy through an auction in 2009.

108. Based on the foregoing facts and under the law, the Plaintiffs are entitled to the return of all transfers made to defendants when they received payment for their shares from the Petters Escrow Accounts, on or about April 27, 2005. Defendants received $12.08 for each share of Polaroid stock they owned. According to Polaroid's proxy statement filed with the Securities and Exchange Commission on March 29, 2005 (the "Proxy"), at the time of the Merger One Equity owned 18,745,000 shares of Polaroid. One Equity affiliates, including JPMorgan and the JPMC Affiliate Defendants, owned 1,255,000 shares. One Equity is liable for all the transfers made to its affiliates and therefore Plaintiffs seek to recover from JPMC transfers totaling $241,600,000 that JPMC and its affiliates received from the Petters Escrow Accounts.

109. To the extent One Equity seeks to disclaim transfers received by its affiliates, Plaintiffs seek recovery from the JPMC Affiliated Defendants as follows:

| | |
|---|---|
| Jacques A. Nasser | $12,817,001 |
| Lee M. Gardner | $201,334 |
| Charles F. Auster | $906,000 |
| James W. Koven | $50,334 |
| Rick A. Lazio | $512,675 |

110. Plaintiffs also seek to recover all transfers received by the Polaroid Control Defendants from the Petters Escrow Accounts for their Polaroid stock in the following amounts:

36

| J. Michael Pocock | $8,544,667 |
| William L. Flaherty | $5,340,447 |
| Ira H. Parker | $1,565,386 |

111.    Plaintiffs also seek to recover transfers made to JPMC to pay interest and principal on the Credit Facility, as JPMC lacked good faith when it received these transfers.  Additionally, at the time of the Credit Facility payments, Polaroid was insolvent.

112.    Each of the above-described transfers (the "Transfers") are fraudulent transfers under the United States Bankruptcy Code and the Minnesota Uniform Fraudulent Transfer Act.

113.    Plaintiffs also seek to avoid all obligations ("Obligations") and pledges of assets ("Pledges") made by Polaroid in favor of JPMC under the Credit Facility because the Pledges and Obligations were made or incurred with the actual intent to hinder, delay or defraud creditors of Petters, PCI or Polaroid and JPMC lacked good faith when it received the Obligations and Pledges.

114.    To the extent that any of the recovery counts below may be inconsistent with each other, they are to be treated as being pled in the alternative.

115.    The Trustees' investigation is on-going and the Trustees reserve the right to amend this original Complaint to include:  (i) further information regarding the Transfers, (ii) additional Transfers, (iii) modifications or revisions to defendants' names, (iv) additional defendants, or (v) additional causes of action that may become known to the

Trustees at any time during this proceeding, through formal discovery or otherwise, and for the additional causes of action to relate back to this original Complaint.

## COUNT I – TURNOVER AND ACCOUNTING

### 11 U.S.C. § 542

116.    The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

117.    The Transfers constitute property of the estates to be recovered and administered by the Trustees pursuant to Section 541 of the Bankruptcy Code.

118.    As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Plaintiffs are entitled to the immediate payment and turnover from defendants of any and all Transfers made by PCI, PGW, PCB, Polaroid and Petters Capital, directly or indirectly, to defendants.

119.    As a result of the foregoing, pursuant to Section 542 of the Bankruptcy Code, the Trustees are also entitled to an accounting of all such Transfers received by defendants from PCI, PGW, PCB, Polaroid and Petters Capital, directly or indirectly.

## COUNT II – FRAUDULENT TRANSFERS

### Actual Fraud - 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551 and 1106

120.    The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

121.    The Debtors transferred money or property to the defendants or incurred obligations to the defendants in connection with the Credit Facility on or within two years before the PCI Petition Date (the "Two-Year Transfers").

122. The Two-Year Transfers represent transfers that were made or obligations that were incurred with actual intent to hinder, delay or defraud a creditor to which the transferor was or became indebted on or after the date of the Transfers.

123. The Two-Year Transfers were made to or for the benefit of defendants in furtherance of a fraudulent investment Ponzi scheme.

124. To the extent that any defendant is not an initial transferee of the Two-Year Transfers, it is an immediate or mediate transferee of the initial transferee of the Two-Year Transfers, and upon information and belief cannot satisfy its burden that it took the Two-Year Transfers for value and in good faith and without knowledge of the voidability of the Two-Year Transfers, or is the entity or individual for whose benefit such Two-Year Transfers were made.

125. As a result of the foregoing, the Trustees are entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(A), 550(a), 551 and 1106: (a) avoiding and preserving the Two-Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two-Year Transfers, or the value thereof, from defendants for the benefit of the estates of the Debtors, and (d) recovering pre-judgment and post-judgment interests, attorneys' fees and costs from defendants.

## COUNT III – FRAUDULENT TRANSFERS

### Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551 and 1106

126. The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

127. At all times material hereto, the Debtors: (a) were insolvent on the dates the Two-Year Transfers were made or became insolvent as a result of the Two-Year Transfers, and/or (b) were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the Two-Year Transfers were effectuated constituted unreasonably small capital, and/or (c) at the time of the Two-Year Transfers, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

128. The Debtors received less than reasonably equivalent value in exchange for the Two-Year Transfers.

129. To the extent that any defendant is not an initial transferee of the Two-Year Transfers, it is an immediate or mediate transferee of the initial transferee of the Two-Year Transfers, and upon information and belief cannot satisfy its burden that it took the Two-Year Transfers for value and in good faith and without knowledge of the voidability of the Two-Year Transfers, or is the entity or individual for whose benefit such Two Year Transfers were made.

130. As a result of the foregoing, the Trustees are entitled to judgment pursuant to Bankruptcy Code §§ 548(a)(1)(B), 550(a), 551 and 1106: (a) avoiding and preserving the Two-Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two Year Transfers or the value thereof from defendants for the benefit of the estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

## COUNT IV – FRAUDULENT TRANSFERS

**Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws**

131.    The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

132.    At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  The Transfers, Obligations and Pledges are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

133.    The Transfers, Obligations and Pledges were made or incurred with actual intent to hinder, delay or defraud a creditor to which the Debtors were or became indebted on or after the date of the Transfers.

134.    The Transfers, Obligations and Pledges were made to or for the benefit of defendants in furtherance of a fraudulent investment scheme.

135.    To the extent that any defendant is not an initial transferee of the Transfers, it is a subsequent transferee of the initial transferee of the Transfers, and upon information and belief cannot satisfy its burden that it took the Transfers for value and in good faith, or is the entity or individual for whose benefit such Transfers were made.

136.    As a result of the foregoing, the Trustees are entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other

states, the fraudulent transfer laws of such other states: (a) avoiding the Obligations and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that any Obligations and the Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

## COUNT V – FRAUDULENT TRANSFERS

**Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws**

137. The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

138. At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e). The Transfers, Obligations and Pledges are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the Bankruptcy Cases.

139. At all times material hereto, the Debtors were engaged in businesses or transactions, or were about to engage in businesses or transactions, for which the property remaining with the Debtors after the Transfers, Obligations and Pledges were effectuated constituted unreasonably small capital.

140. The Debtors received less than reasonably equivalent value in exchange for the Transfers, Obligations and Pledges.

141. To the extent that any defendant is not an initial transferee of the Transfers, it is a subsequent transferee of the initial transferee of the Transfers, and upon information and belief cannot satisfy its burden that it took the Transfers for value and in good faith, or is the entity or individual for whose benefit such Transfers were made.

142. As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Obligations and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that any Obligations, Pledges and Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

## COUNT VI – FRAUDULENT TRANSFERS

**Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws**

143. The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

144. At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code §

502(e). The Transfers, Obligations and Pledges are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim in the Bankruptcy Cases.

145. At all times material hereto, the Debtors, at the time of the Transfers, Obligations and Pledges, intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

146. The Debtors received less than reasonably equivalent value in exchange for the Transfers, Obligations and Pledges.

147. To the extent that any defendant is not an initial transferee of the Transfers, it is a subsequent transferee of the initial transferee of the Transfers, and upon information and belief, cannot satisfy its burden that it took the Transfers for value and in good faith, or is the entity or individual whose benefit such Transfers were made.

148. As a result of the foregoing, the Trustees are entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Obligations and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligations, Pledges and Transfers be set aside, (c) recovering such Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

## COUNT VII – FRAUDULENT TRANSFERS

**Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws**

149.    The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

150.    At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims against the Debtors that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  The Transfers are avoidable under applicable non-bankruptcy law by a creditor holding an unsecured claim in the Bankruptcy Cases.

151.    At all times material hereto, the Debtors, at the time of the Transfers, Obligations and Pledges, were insolvent or, in the alternative, the Debtors became insolvent as a result of the Transfers.

152.    The Debtors received less than reasonably equivalent value in exchange for the Transfers, Obligations and Pledges.

153.    To the extent that any defendant is not an initial transferee of the Transfers, it is a subsequent transferee of the initial transferee of the Transfers, and upon information and belief, cannot satisfy its burden that it took the Transfers for value and in good faith, or is the entity or individual for whose benefit such Transfers occurred.

154.    As a result of the foregoing, the Trustees are entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other

states, the fraudulent transfer laws of such other states:  (a) avoiding the Obligations and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligations, Pledges and Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

## COUNT VIII – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

155.    The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

156.    At all times relevant hereto, all funds received by defendants were part and parcel of the Ponzi scheme and were derived from monies fraudulently obtained by Petters and PCI and from other investors or participants in the Ponzi scheme.

157.    Defendants, as the recipients of fraudulently obtained proceeds of the Ponzi scheme have no rightful or legitimate claim to such monies.

158.    Defendants knowingly received monies from the Debtors and those monies were derived from the Ponzi scheme, Defendants were unjustly enriched through their receipt of the fraudulently obtained monies to the detriment of the Debtors' estates, and in equity and good conscience Defendants must be required to repay the proceeds received.

159.    Defendants must, therefore, in equity be required to disgorge all proceeds received through the operation of the Ponzi scheme, so as to allow the Trustees to

distribute in equity any such ill-gotten gains among all innocent investors and creditors of the Debtors.

## COUNT IX – DISALLOWANCE

### 11 U.S.C. § 502(b) and (d)

160.    The Trustees reallege and incorporate by reference the preceding paragraphs of the Complaint as if fully set forth herein.

161.    To the extent that any defendant asserts it is entitled to any claim in these Bankruptcy Cases, directly on its own account or indirectly by virtue of any other agreement with Petters, PCI, PGW, Polaroid, Petters Capital, or any of their affiliates, such claim is unenforceable against the Debtors or the property of the Debtors under any agreement or applicable law and should be disallowed under 11 U.S.C. § 502(b).

162.    Further, any claim of an entity from which property is recoverable under 11 U.S.C. § 550 or held by a transferee of a transfer that is avoided under 11 U.S.C. §§ 544 or 548 shall be disallowed by the Court unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable. JPMC has failed and refused to pay any such amounts or to turn over any such property.

163.    As a result of the foregoing, to the extent that any defendant asserts it is entitled to any claim in these Bankruptcy Cases, directly on its own account or indirectly by virtue of any other agreement with Petters, PCI, PGW, Polaroid, Petters Capital, or any of their affiliates, all such claims are and should be in all things disallowed.

WHEREFORE, the Trustees respectfully request judgment in favor of Plaintiffs and against defendants as follows:

A.      Count I (Turnover and Accounting):  pursuant to Sections 541, 542, 550(a) and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Transfers be immediately delivered and turned over to the Trustees, and (b) for an accounting by defendants of the property that was the subject of the Transfers or the value of such property.

B.      Count II (Fraudulent Transfers - Actual Fraud):  pursuant to 11 U.S.C. §§ 548(a)(1)(A), 550(a), 551 and 1106:  (a) avoiding and preserving the Two Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two-Year Transfers or the value thereof from defendants for the benefit of the estates of the Debtors, and (d) recovering pre-judgment and post-judgment interests, attorneys' fees and costs from defendants.

C.      Count III (Fraudulent Transfers - Constructive Fraud): pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a), 551 and 1106:  (a) avoiding and preserving the Two-Year Transfers free and clear from any claimed interest of defendants, (b) directing that the Two-Year Transfers be set aside, (c) recovering such Two-Year Transfers or the value thereof from defendants for the benefit of the estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

D.      Count IV (Fraudulent Transfers – Actual Fraud): pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the

laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Obligations and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligations Pledges and Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

E.      Count V (Fraudulent Transfers - Constructive Fraud): pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Obligations and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligations, Pledges and Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from defendants.

F.      Count VI (Fraudulent Transfers - Constructive Fraud): pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of

such other states: (a) avoiding the Obligations and Pledges and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

G.      On Count VII (Fraudulent Transfers - Constructive Fraud): pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Obligations and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligations, Pledges and Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants for the benefit of the bankruptcy estates of the Debtors, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from defendants.

H.      Count VIII (Unjust Enrichment/Equitable Disgorgement): declaring and ordering that the Trustee shall recover the Transfers and any other monies received by defendants, directly or indirectly, from the fraud perpetrated through the Ponzi scheme, or the value thereof, for the benefit of the bankruptcy estates of the Debtors; and that defendants shall be liable to

the bankruptcy estates of the Debtors in an amount equal to all monies received and shall be required to disgorge the same for the equitable distribution to all creditors of the Debtors.

I.      Count IX (Disallowance): pursuant to 11 U.S.C. § 502(b) and (d):  declaring and ordering that, to the extent that any defendant asserts it is entitled to any claim in these Bankruptcy Cases, directly on its or his own account or indirectly by virtue of any other agreement with Petters, PCI, PGW, Polaroid, Petters Capital or any of their affiliates, all such claims are in all things disallowed;

J.      On all Claims for Relief, establishment of a constructive trust over the proceeds of the Transfers in favor of the Trustees for the benefit of the Debtors' estates;

K.      Awarding the Trustees all applicable interest (including pre-judgment and post-judgment interest), attorneys' fees, costs and disbursements in this action; and

L.      Granting the Trustees such other, further and different relief as the Court deems just, proper and equitable.

FRUTH, JAMISON & ELSASS, PLLC

Dated:   October  10 , 2010          By s/ Thomas E. Jamison
                                            Thomas E. Jamison (#220061)
                                            Douglas L. Elsass (#219241)
                                            K. Jon Breyer (#302259)
                                            Adam A. Gillette (#0328352)
                                  3902 IDS Center
                                  80 South Eighth Street
                                  Minneapolis, MN 55402
                                  Telephone:   (612) 344-9700

*ATTORNEYS FOR DOUGLAS A. KELLEY*
*CHAPTER 11 TRUSTEE OF PETTERS*
*COMPANY, INC., ET. AL.,  JOHN R.*
*STOEBNER TRUSTEE FOR POLAROID*
*CORPORATION, ET. AL., AND RANDALL L.*
*SEAVER TRUSTEE FOR PETTERS CAPITAL,*
*LLC*